No. 2-19-0276
Order filed March 23, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-179 |
| JAMES R. WILLIAMS, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1  *Held*:  We affirm defendant's convictions and sentence. Defendant forfeited his contention the trial court erred by precluding him from eliciting testimony from the victim of his acquittal in a prior unrelated domestic battery case, and, while the court erred by precluding the inquiry, relief was not warranted because the evidence was not closely balanced. The trial court did not abuse its discretion by refusing a defense-of-property instruction where the instruction referenced real, not personal property, defendant acquiesced to the error, and, in any event, the evidence did not support giving the instruction. The court's consideration of evidence of pending charges without accepting live testimony was error but, where the record shows the court placed insignificant weight on that evidence, the error was harmless.

¶ 2  A jury found defendant, James R. Williams, guilty of two counts of domestic battery

(bodily harm and insulting or provoking contact) (720 ILCS 5/12-3.2(a)(1), (2) (West 2016)). The

trial court sentenced him to six years' imprisonment. Defendant appeals, arguing the court (1) erred by precluding him from eliciting evidence of his acquittal in a prior domestic battery case involving the same victim, (2) abused its discretion by refusing to instruct the jury on the issue of defense of property, and (3) erred at sentencing by relying on the State's representations about pending charges, by way of police reports, without receiving testimony of their underlying facts. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5     A grand jury indicted with, *inter alia*, one count of aggravated domestic battery and two counts of Class 4 domestic battery, alleging that on January 29, 2017, defendant struck Angelica Silva on her head and body. The aggravated domestic battery count alleged defendant caused Silva great bodily harm by fracturing her orbital bone, and the two Class 4 domestic battery counts alleged defendant caused bodily harm and made physical contact of an insulting or provoking nature.

¶ 6                                    B. Pretrial Proceedings

¶ 7     Before trial, defendant elected to proceed *pro se*. As part of its admonishments, the trial court informed defendant he would be held to the same standard as an attorney, and defendant indicated his understanding.

¶ 8     In addition, pursuant to section 115-7.4(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4(a) (West 2016)), the State moved to admit evidence of other acts of domestic violence, relating to a November 8, 2015, incident during which defendant struck Silva (the November 2015 Silva case) and a March 13, 2018, incident during which he struck Melissa Mercer (the Mercer case). After a hearing, the court granted the motion.

¶ 9     The same day, defendant informed the State and the court he would be relying on the defenses of self-defense and defense of property at trial.

¶ 10                                    C. Trial

¶ 11                         1. *The January 29, 2017, Incident*

¶ 12     At trial, Silva testified she and defendant dated in 2014 or 2015 but, on January 29, 2017, they were no longer dating. In the early morning hours of January 29, 2017, she went to the Smooth Fox night club in Elgin after she heard defendant was there with another woman. Silva, who was angry, approached defendant and began speaking with him. A woman who was with defendant confronted Silva, and they began to argue. Silva left the Smooth Fox and sat in her truck crying.

¶ 13     She observed defendant leave the Smooth Fox with a woman, arguing. Silva exited her truck, approached them, and the woman began arguing with her and spitting in her face in the street near defendant's vehicle. At some point, Silva entered the front passenger side of defendant's vehicle. Defendant also entered the vehicle, and he and Silva began arguing about defendant being with another woman. Defendant told Silva to leave the vehicle and then hit her on the side of her head. He exited the vehicle, walked to the passenger side, opened the door, hit Silva again in the face, dragged her from the vehicle to the ground, and drove away. (Footage from a surveillance camera positioned at Chicago Street and Grove Avenue, which was admitted into evidence, shows Silva and defendant enter the vehicle and remain inside for several minutes. It also shows defendant exit the vehicle, walk to the passenger side, reach inside, pull Silva out onto the ground, and drive away.) Silva testified she did not call 911; rather, police officers who were already on the scene approached her as she sat on the sidewalk.

¶ 14     Silva testified she was transported to the hospital, and, just before the State showed her photographs of her injuries, she interrupted the proceedings, stating "I don't want to do this thing.

Why am I pressured to do this? I don't want to do this. *** It was all a mistake." The State then asked her whether she wanted "to be here," to which she responded, "No. I feel like I'm being pressured to do this. I can't." Asked whether she would prefer "this [to] just all go away," she responded, "Correct. I moved on." The court recessed the proceedings for Silva to compose herself.

¶ 15    When the proceedings resumed, Silva authenticated photographs of her injuries, which depicted blood on her mouth and coming out of her nose and a bump on her forehead. Silva testified she bled after defendant struck her but she did not remember the bump on her forehead

¶ 16    On cross-examination, Silva testified she did and did not have a fight with a woman inside the Smooth Fox. "Some people that were there" broke up the fight, but Silva could not recall whether security personnel got involved or whether she was kicked out of the club. Defendant and Silva "made a plan" to get into his vehicle and, once inside, argued about the woman. Defendant "kept telling [her] to get out," but Silva remained in the vehicle. Silva denied attacking defendant while inside the vehicle, damaging the interior of the vehicle, and tearing television (TV) screens from the headrests and trying to hit defendant with them. Rather, she "was pulling on [him]" and "telling th[e] woman to leave," when defendant hit her. She never told defendant she hit herself with the TVs while trying to rip them out, and she could not remember how she got (and did not know why she had) a knot on her forehead. Silva denied telling defendant that she was attacking him and that, as he tried to keep her at bay, he was defending himself, pushing her away, and "blocking stuff that [she] was throwing at [him]," rather than intentionally hitting her with a closed fist. When he hit her, she was looking out the window, smoking, and not looking at defendant.

¶ 17    Silva further testified that, on the night of the January 2017 incident, she had been drinking, was "high," and was unable to remember everything that happened that evening. She testified it was possible that all of the injuries she suffered were not caused by defendant. At a prior

proceeding, she testified she did not have any physical contact with defendant or anyone else inside the Smooth Fox.

¶ 18   On re-direct, Silva confirmed she sustained injuries to her face after defendant hit her twice in the car. As she left the witness stand, she interjected, "He doesn't deserve this. *** He doesn't deserve any of this." After the bailiff stated, "It's okay," Silva stated "No, it's not okay. It's not okay."

¶ 19   Officer Joshua Miller testified that, shortly before 2 a.m. on January 29, 2017, he was dispatched to South Grove Avenue in Elgin after receiving a call relating to a domestic battery. When he arrived on scene, he saw Silva, who had a large bump on the right side of her forehead and blood around her mouth and lips, sitting on the sidewalk. Silva told him she had a verbal argument with defendant inside the Smooth Fox and that he was the person involved in the battery. An ambulance arrived and transported Silva to the hospital. Miller went to the hospital and photographed Silva's injuries. (The photographs are consistent with Silva's and Miller's descriptions of Silva's injuries.) He did not investigate inside the Smooth Fox to determine whether a fight had taken place.

¶ 20   Officer Miller reviewed the surveillance footage from outside the Smooth Fox, and he observed the vehicle rocking back and forth. On the video, he did not see defendant throw a punch prior to pulling Silva from the vehicle. He explained the camera was unable to capture what transpired inside the vehicle but, in any event, he did not see defendant draw back as if he were going to throw a punch.

¶ 21   Elgin firefighter/paramedic Matthew Barreto testified that he observed Silva's facial injuries, which included a contusion on her face, a swollen lip, and bloody nose. Silva, who was

upset and distraught, told him she had been struck by a fist. Silva was given a cervical collar and ice pack and transported to the hospital.

¶ 22    Emergency room physician Brian Kostuk evaluated and treated Silva at the hospital. Silva had pain and swelling on the right side of her face and around her right eye, and a CT scan revealed she had a fracture of her orbital bone, as well as significant bleeding in the maxillary sinus underneath her right eye. Dr. Kostuk directed her to follow up with an ear, nose, and throat specialist but did not know whether she, in fact, followed up or whether she required surgery. According to Dr. Kostuk, though Silva's injury did not require immediate surgery, it was a significant injury that held a risk of developing into a major injury, including vision loss.

¶ 23    Around 2 a.m., Elgin police officer David Lackey spoke with Miller, and Lackey went to defendant's residence. (The record does not indicate Miller went to defendant's residence.) He saw defendant's vehicle parked outside. Officer Nicholas Mondek and other officers arrived at the residence, and Mondek approached the front door and knocked while Lackey "maintained a position at the rear of the residence on the perimeter." A woman answered the door and closed it at the direction of a man whom Mondek later identified as defendant. The officers maintained a perimeter at the residence while a search warrant was obtained.

¶ 24    Around 9 a.m., a tactical response team arrived to execute the search warrant. Before the team entered the residence, they directed the occupants to exit, and a woman did so. The team entered the residence and eventually located defendant in the attic, directed him to exit, and when he did so, arrested him. (Body camera footage, which was admitted into evidence, shows the team's search of the residence and defendant's arrest.)

¶ 25                    2. *The November 2015 Silva Case*

¶ 26    Silva also recounted a physical altercation which occurred between her and defendant, on November 8, 2015, while they were dating. In the early morning hours, she and defendant got into an argument at the After Set bar in Elgin. The argument turned physical, and defendant put his hands around her neck. Silva left the bar and went to El Faro's restaurant, where she called defendant. Defendant came to the restaurant, and the two argued. She "started pulling on him," and defendant struck her in the mouth, causing her lip to bleed. She left, went to the Elgin police department, and told them what had happened. (Photographs of the injuries she sustained in this incident were admitted into evidence.)

¶ 27    On cross-examination, Silva testified she went to the restaurant because that was where defendant was. She denied defendant was by a woman at After Set, that she smacked the woman, prompting the fight, and that the woman ripped off her necklace. The following colloquy then occurred:

"Q. What happened – do you remember what happened with that trial, if I got found guilty?

[Assistant State's Attorney]: Judge, objection.

THE COURT: Sustained.

***

Ask another question. It's an improper area of inquiry.

[Defendant]: I can't ask if I beat the case?

THE COURT: That's correct."

¶ 28                    3. *The March 2018 Mercer Case*

¶ 29    Mercer testified that, on March 13, 2018, she and defendant were at the Super 8 hotel in Elgin. While alone in a hotel room, they "were drinking, doing drugs, [and] partying," and began to argue. After testifying she did not remember whether the argument turned physical, the State

introduced her prior testimony in the Mercer case. In her prior testimony, Mercer stated the argument turned physical, defendant punched her in the face and mouth, and she asked him to leave the room. As she laid on the ground between the two beds, defendant said "he should kick [her] in [her] face," to which she replied "why would you do that[?]" She then testified she thought she remembered defendant kicking her but she had passed out.

¶ 30    After defendant punched and kicked her in the hotel room, she walked to the lobby area of the hotel, where defendant punched her in the face. The punch was captured on surveillance cameras and was shown to the jury in this case. The punches and kicks caused injuries to Mercer's face, photographs of which were also shown to the jury in this case.

¶ 31    On cross-examination, Mercer testified nobody told her how to testify in the prior case and everything she had told the State was true. Before her testimony, she talked to a private attorney, who told her she would "get 10 years" if she did not testify consistently with her testimony in the prior proceeding. Mercer testified she attacked defendant "over some drugs" but, on re-direct examination, acknowledged that, in her prior testimony, she denied she stabbed, scratched, or hit defendant because there would have been no purpose for doing so—she could not fight defendant because of defendant's size advantage.

¶ 32                            4. *Defendant's Evidence*

¶ 33    Defendant's current girlfriend, Naomi Vega, testified that, on January 29, 2017, she drove to the Smooth Fox with defendant. Silva, who was "very agitated," arrived at the Smooth Fox and got into a fight with "Yvette." Vega could not recall whether Yvette hit Silva.

¶ 34    On the way to the Smooth Fox, defendant's vehicle "was fine." The next day, Vega observed the TV head rests "were out of place" and had been "taken out." She also noticed the stereo had been "tampered with" and footprints on the side of the stereo. (Vega took photographs

of the damage to defendant's vehicle, and defendant attempted to introduce them at trial. However, because defendant failed to disclose them to the State before trial, the court precluded defendant from doing so.)

¶ 35    On cross-examination, Vega testified she was taken to the Elgin police department when the search warrant was executed at her house. She spoke with an officer but did not tell him she had seen an altercation inside the Smooth Fox. She denied telling the officer she did not recall any type of incident occurring at the Smooth Fox. She told the officer she was "very intoxicated" and "couldn't really remember anything."

¶ 36                                  5. *The State's Rebuttal Evidence*

¶ 37    In rebuttal, detective Michael Martino testified he spoke with Vega, and, though he asked her, she did not tell him an incident had occurred inside the Smooth Fox.

¶ 38                                  6. *The Jury-Instruction Conference*

¶ 39    At the jury-instruction conference, defendant proposed instructions on the issues of self-defense and defense of property. Defense instruction No. 3, taken verbatim from Illinois Pattern Jury Instructions (Criminal) No. 24-25.06 (approved October 26, 2018) (IPI Criminal), stated as follows:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the commission of great bodily harm to himself."

¶ 40    Defense instruction No. 4, taken from IPI Criminal No. 24-25.08, stated as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to terminate another's trespass on real property other than a dwelling lawfully in his possession.

However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the commission of (  )."

¶ 41   The court and parties discussed the defense instructions. Defendant argued Silva admitted she entered his vehicle without permission, "pull[ed] on him," and did not exit the vehicle. He asserted, as she attacked him, he was protecting his vehicle as she "tore [it] up" and himself. Defendant argued Silva's admission to "pulling on" him was "some form of battery of some sort." The court refused the instruction, finding the record did not contain any evidence to support the self-defense instruction.

¶ 42   After a break in the proceedings, the State informed the court that it would not object to the self-defense instructions the court had refused. Accordingly, the parties again discussed the instructions relating to defendant's affirmative defenses. The State informed the court it was asking that defense instruction No. 3 be given. Defendant indicated he had no objection. The court then stated, "What about this Number 4 with the parenthesis? I don't think that's any longer necessary." The State responded, "No, Judge." The court asked defendant whether he was "satisfied with the instructions now," and defendant answered affirmatively.

¶ 43                              7. *Closing Arguments*

¶ 44   In closing, the State argued, in part, that, based on his actions in the November 2015 Silva case and the Mercer case, defendant had the propensity to commit acts of domestic violence. The State asserted the evidence established defendant caused Silva great bodily harm and, while Silva

admitted she had a "fight" inside the Smooth Fox, there was no evidence she had actually been struck or hit inside the club. Further, the State contended defendant was not justified in using the force he used, arguing defendant did not have to strike Silva in the face with such force as to cause an orbital fracture in order to remove her from the vehicle and that the evidence did not show Silva was acting in a manner where defendant was reasonably in fear of great bodily harm. Instead, the State argued, defendant could have left the vehicle or called for help. In addition, the State argued defendant's flight from the scene and his hiding in the attic evidenced his guilt, as a person who had been hit or whose vehicle had been destroyed would have waited for police to arrive.

¶ 45    Defendant argued he did not cause Silva great bodily harm, noting Silva admitted she fought at the Smooth Fox, stated it was possible her injuries were not caused by defendant, and the doctor did not classify Silva's injuries as major injuries. Defendant also pointed out inconsistencies in Silva's testimony, including the number of times she said defendant hit her and how she came to be inside defendant's vehicle. Defendant also addressed the other-crimes evidence. In regard to the Mercer case, he told the jury what he did was wrong, but nevertheless justified because they were "drinking, doing drugs, and *** fighting." In regard to the November 2015 Silva case, defendant asserted nothing about the incident was true and Silva's testimony regarding the incident was inconsistent. He also, on two occasions, noted the jury found him not guilty in that case. The State objected each time to defendant's assertion he had been found not guilty on the basis that it was not supported by the evidence, and the court sustained the objection, instructing the jury to disregard any argument not supported by the evidence.

¶ 46    On the issue of justification, defendant noted Silva got into his car without his permission, thereby committing a trespass to his property, and admitted to making physical, insulting, and provoking contact with him. Therefore, he argued, he was justified in pulling her from the vehicle.

¶ 47                                    8. *The Jury's Deliberations and Verdicts*

¶ 48     During its deliberations, the jury sent three questions to the court, asking it to (1) define "great bodily harm," (2) define "bodily harm," and (3) "clarify the justification for the second count, bodily harm." After discussing the questions with the parties, the court answered them without objection as follows:

> "[As to the first two questions, y]ou have received the law that applies to this case. I cannot provide you with a definition for great bodily harm or bodily harm.

> [As to the third question, t]here are three charges for you to decide. You have the instructions for those three charges."

¶ 49     The jury found defendant guilty of domestic battery (bodily harm) and domestic battery (insulting or provoking contact) and not guilty of aggravated battery (great bodily harm).

¶ 50                                    D. Defendant's Motion for New Trial

¶ 51     Defendant moved for a new trial, arguing, in pertinent part, the court erred by refusing to instruct the jury, "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to terminate another's tresspass [*sic*] on real property other than a dwelling lawfully in his possession." Defendant did not raise any issue with respect to the court's preclusion of his inquiry into the jury's verdict in the November 2015 Silva case. The court denied the motion, noting that, with respect to the jury instructions, the court was "careful in the instructions that were given," that it gave the correct instructions, and that it did not believe there was any evidence to support the proposed instruction.

¶ 52                                    E. Sentencing

¶ 53     Prior to sentencing, the court ordered a presentence investigation report (PSI) be prepared for defendant. The PSI indicated that defendant declined to be interviewed for the report. The

probation officer used the information obtained for the PSI she prepared in the Mercer case, updating only defendant's criminal history.

¶ 54    The PSI set forth defendant's criminal history, which spanned 26 years, from his first adjudication as a delinquent minor in 1992 to his most recent conviction in 2018. The PSI indicated defendant's juvenile conviction was for aggravated battery, and he received a sentence of probation which was revoked when he committed the offense of mob action. As an adult, he had 12 prior felony convictions, all but 4 of which involved possession of firearms or crimes of violence, 4 misdemeanor convictions, and 4 traffic or ordinance violations.

¶ 55    At sentencing, the State introduced four exhibits, the first two of which were "police department synopsis sheet[s]." The first synopsis sheet reflected that, on December 5, 2018, defendant had been charged with battery as a result of his striking, while incarcerated, of another detainee because he "felt threatened" and the incident was captured in surveillance footage (the jail battery case). (The State later dismissed the charges.)

¶ 56    The second synopsis sheet indicated that, on May 29, 2017, defendant had been charged in case No. 17-CF-1046 with two counts of domestic battery in relation to his striking of Vega (the Vega case). (The State later dismissed the charges.) The synopsis stated that Vega called 911, and the dispatchers overheard arguing, crying, and then a struggle before losing contact with Vega. When an officer arrived at the scene, he observed Vega crying and blood on her face and sweatshirt. Vega told police she and defendant had argued on the way home from a cookout and, when they arrived at their residence, defendant placed an open hand on her face, forcibly pushed her, and, when she called the police, he tried to take away her phone. Vega told police she did not know from where the blood had come and refused to provide a written statement or submit to photographs of her injuries. The State's third exhibit was a recording of Vega's 911 call.

¶ 57    The State's last exhibit was a police report and photographs relating to a September 2015 incident involving defendant and Silva (the September 2015 Silva case). The report stated that officers arrived at a residence and made contact with Silva, who had blood on her nose, hands, arms, and shirt. Officers entered the residence and observed blood spatter on the kitchen walls, counter, and cabinets, a mirror, and a large amount of blood on the kitchen floor which appeared to have been partially mopped. Silva told officers defendant came over to the house to reconcile their recently terminated dating relationship and that several young men she did not know knocked on the door. Defendant became "heated," accusing Silva of dating the men, struck Silva once in the face, and then grabbed her head and forced her to the kitchen floor, where he held her for several minutes. Eventually, Silva obtained her phone and called 911, but defendant took the phone, terminated the call, and threw the phone. Silva reluctantly agreed to provide a written statement and permit photographs of her injuries to be taken. Attached to the report were photographs of Silva's residence and injuries. (Criminal charges arising from this incident were pursued in Cook County. It is unclear whether defendant was convicted.)

¶ 58    Defendant objected to each exhibit on the basis that the cases were still pending. The court overruled defendant's objections, finding it was permitted to consider pending cases for purposes of sentencing.

¶ 59    The State also presented the testimony of Elgin police officers Michael Fuller, Mark Sopek, and Christopher Hughes. Fuller testified that, on February 5, 2016, he was dispatched to Silva's residence in relation to an altercation between her and defendant, during which defendant kicked her in the back. Silva's two daughters and an independent witness told Fuller defendant had kicked Silva, and defendant denied it. However, Fuller observed a footprint on Silva's "lower back, hip region."

¶ 60    Sopek testified that, on June 22, 2016, Silva came to the police station and made a report that defendant had been harassing her by telephone.

¶ 61    Hughes testified that, on January 24, 2004, he investigated the shooting of Terry Johnson, who had been shot in the stomach during a robbery. Johnson and a second person identified defendant as the person who shot Johnson. Officers went to defendant's residence and located him hiding in a closet. Defendant was ultimately convicted of armed robbery for his participation in this offense.

¶ 62    Defendant did not present any evidence in mitigation. In his statement in allocution, defendant accepted responsibility for his actions in the Mercer case but otherwise downplayed his role in and responsibility for his past criminal behavior.[1] He noted the court had, in the sentencing hearing following his conviction in the Mercer case, characterized him as a "woman beater" who was a danger to women and to his community and asserted the court's opinion "was formed against [him] based on a bunch of false testimony and stuff that just weren't [*sic*] true." He stated he was paying the consequences for his mistakes and was focusing on making better decisions in the future.

¶ 63    In aggravation, the State argued that defendant was eligible for extended-term sentencing based on his background and asserted the maximum sentence, *i.e.*, six years' imprisonment, to run consecutive to his sentence in the Mercer case, was an appropriate disposition. In doing so, the State noted that, while the jury did not find defendant had caused Silva's orbital fracture, the court could nevertheless consider Dr. Kotsuk's testimony that Silva's orbital bone was fractured. In addition, the State observed defendant had a lengthy criminal history, which included an

---

[1] The court asked defendant for his statement in allocution prior to the parties' arguments in mitigation and aggravation.

adjudication as a delinquent minor, for which he received a sentence of probation which was later revoked, and 12 prior felony convictions, 4 misdemeanor convictions, and 4 traffic violations over the span of 26 years, many of which were for violent offenses. Further, the State noted, despite defendant's statement he had been working on making better choices while incarcerated, defendant had been charged with battery while awaiting sentencing. The State argued defendant was a threat to the community, especially women, and a lengthy sentence was necessary to deter others from committing the same or similar crimes. The State also highlighted the significant impact defendant's actions had on Silva and the other women he had battered (Mercer and Vega), who had been carrying the emotional scars of defendant's abuse. The State also commented on the pending charges in the Vega case, noting it would likely have to dismiss the charges because Vega was unlikely to testify. Finally, the State observed that defendant had shown no remorse for his past actions and blamed "everyone else for his poor choices."

¶ 64    In mitigation, defendant did not address the statutory mitigation factors but, rather, focused on what he perceived to be misrepresentations and overstatements made by the State in its argument. He argued the State had been sharing his "personal business" with his other victims in an effort to make people "feel some type of way towards *** or hate [him]." He noted he had been sentenced to 10 years' imprisonment in the Mercer case and acknowledged he "was wrong for that." With respect to the instant case, defendant asserted Silva had admitted to arriving at the Smooth Fox upset, having a fight inside, getting into his vehicle without permission, and physically grabbing him, and noted he did not go looking for her and that "one thing led to another." He also noted he and Silva had made peace and, on the stand, she stated he did not "deserve this [and] it was all a mistake." He downplayed his criminal history and argued, in any event, the way he lived in his past was not the way he lived now. He also downplayed his role in the jail battery case,

noting "the guy came to [him] and started the incident." Defendant argued the State's recommendation of the maximum term, *i.e.*, six years, was "extreme," especially given Silva had "admitted to doing the same exact thing to [him], basically."

¶ 65 The court found defendant eligible for an extended-term sentence based on his criminal history. It sentenced defendant to the maximum term of six years' imprisonment, to be served consecutively to the 10-year sentence he received in the Mercer case based on the fact he committed that offense in the Mercer case while he was on bond in this case. In doing so, the court noted it had considered the evidence at trial, the PSI, the financial impact of incarceration, the evidence and arguments presented in mitigation and aggravation, and defendant's allocution. The court specifically found probation was not warranted in this case because it would deprecate the seriousness of the offense. The court noted defendant had not argued any of the statutory mitigation factors and nevertheless found those factors did not apply. The court further observed defendant was unable to accept responsibility for his actions in this and prior cases, noting that, unless the offense was captured on video (as in the Mercer case), defendant had either denied it happened or attributed it to witnesses lying. The court noted defendant's criminal history was comprised of mostly violent offenses and, in considering the safety of the public and defendant's rehabilitative potential, which it found to be "zero," the maximum sentence was warranted.

¶ 66 F. Defendant's *Pro Se* Motion to Reconsider Sentence

¶ 67 Defendant, still *pro se*, filed a motion to reconsider sentence, arguing, in relevant part, the court abused its discretion by considering his arrest and pending charge in the Vega case. In addition, defendant asserted he was entitled to additional presentence custody credit against his sentence. Defendant thereafter requested counsel be appointed to represent him in relation to his motion to reconsider sentence and, over the State's objection, the court granted his request.

¶ 68    At the hearing on the motion, at which defendant was represented by counsel, counsel did not raise any additional argument with respect to the court's consideration of defendant's arrests and pending cases but, rather, stood on that aspect of the written motion. The court granted defendant's motion insofar as it related to his request for additional presentence custody credit and denied it in all other respects. This appeal followed.

¶ 69                                II. ANALYSIS

¶ 70                            A. Acquittal Evidence

¶ 71    Defendant first contends the trial court erred by precluding him from inquiring of Silva about his acquittal in the November 2015 Silva case. Defendant acknowledges he forfeited review of this purported error by failing to include it in his posttrial motion and asks us to consider it under the plain-error doctrine.

¶ 72    The plain-error doctrine is a narrow exception to the forfeiture rule, which permits the reviewing court to excuse a party's procedural default and grant relief if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant has the burden of persuasion under either prong of plain error. *People v. Fort*, 2017 IL 118966, ¶ 18. The first step in the analysis is to determine whether there was error. *People v. Wilmington*, 2013 IL 112938, ¶ 31.

¶ 73    We review the trial court's ruling on the admission of acquittal evidence for an abuse of discretion. *People v. Ward*, 2011 IL 108690, ¶ 21; see also *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 57 (limitation of cross-examination rests within the sound discretion of the trial court

and will not be reversed absent an abuse of discretion). An abuse of discretion occurs when no reasonable person would adopt the trial court's view. *Ward*, 2011 IL 108690, ¶ 21.

¶ 74　Defendant, relying on *Ward*, argues the trial court abused its discretion by barring his inquiry into his acquittal in the November 2015 Silva case. Defendant asserts the conduct at issue in the prior trial was essentially the same and involved the same victim and, therefore, it was critical for the jury to understand he had been acquitted of that offense. According to defendant, because he was precluded from eliciting testimony from Silva on this issue, "the jury was free to falsely believe that [defendant] had been convicted of another crime against Silva." We agree.

¶ 75　In *Ward*, the defendant was charged with criminal sexual assault and, at trial, raised the defense of consent.[2] *Id.* ¶¶ 6, 8. Before trial, the trial court had granted the State's motion to admit evidence of his prior sexual assault of another victim of which he was found not guilty. *Id.* ¶ 8. Also before trial, the State had filed a motion *in limine*, seeking to bar evidence of the jury's acquittal of the defendant in that case, which the court granted. *Id.* ¶ 10. During the victim's testimony, two references to her prior testimony were made during cross-examination. *Id.* ¶¶ 10, 14.

¶ 76　The supreme court held the trial court's preclusion of the acquittal evidence was an abuse of discretion and warranted a new trial. In doing so, the supreme court performed a balancing test

---

¶ 1　[2] Admittedly, *Ward* differs from this case in that it involved the admission of other-sex-crimes evidence under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2006)), not, as here, the admission of other-domestic-violence-crimes evidence under section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2016)). We nevertheless find *Ward*'s analysis instructive.

under which it weighed the probative value of the evidence against undue prejudice to the defendant. *Id.* ¶ 35. Addressing the probative value of the acquittal evidence, the supreme court explained the trial court's preclusion of the evidence "severely limited the jury's ability to assess [the victim's] testimony in a fully realistic context" and may have "artificially enhanced [her] credibility." *Id.* ¶ 38. Addressing the potential for unfair prejudice to defendant if the acquittal evidence was barred, the supreme court explained the exclusion of the evidence "left the jury to speculate whether those charges against defendant were ongoing or had already been resolved." *Id.* ¶ 43.

¶ 77    We conclude the trial court abused its discretion by precluding defendant's inquiry with Silva into the results of the November 2015 Silva case. Here, like in *Ward*, the State was permitted to elicit evidence of defendant's prior alleged battery of Silva to show his propensity to commit acts of domestic violence. Given the fact the November 2015 Silva case involved the same victim and substantially similar circumstances and conduct as in this case, Silva's credibility was artificially enhanced, as was the probative value of the other-crimes evidence. See *id.* ¶ 38. Thus, defendant should have been permitted to place Silva's testimony regarding that incident in context by informing the jury he had been acquitted of the offense. *Id.* By prohibiting this evidence, the trial court precluded the jury from hearing all the evidence affecting the probative value and reliability of the other-crimes evidence necessary to weigh it properly. *Id.*

¶ 78    The State attempts to distinguish *Ward* on the bases that the defendant in *Ward* was represented by counsel and had "merely a single prior charge" for the same conduct, as opposed to defendant here who had "multiple prior convictions for the same category of offense." According to the State, the "handling of the acquittal evidence in this case ran the risk of confusing the jury due to defendant's complex criminal history and multiple prior convictions for domestic

violence offenses," and defendant was unqualified to address his prior acquittal without distorting its legal significance or misleading the jury. We are not persuaded.

¶ 79    We are unable to discern, without more explanation from the State, how defendant's "complex criminal history," involving multiple domestic battery convictions, distinguishes this case from *Ward*. Further, the record contains no indication defendant sought to elicit any information other the mere fact of his acquittal in the November 2015 Silva case. We fail to see how this would have misled or confused the jury.

¶ 80    The State also relies on several federal decisions which stand for the proposition that acquittal evidence is hearsay and is generally irrelevant, except in cases where a defendant invokes double jeopardy or collateral estoppel. The supreme court in *Ward* rejected a similar argument (*Ward*, 2011 IL 108690, ¶¶ 33-34), and we likewise reject it here.

¶ 81    The State also argues defendant made repeated references to his acquittal in the presence of the jury, sufficiently informing it of his acquittal. According to the State, "those bells could not be entirely unrung." We reject the State's argument. While it is true the jury heard defendant's references to his acquittal, the record shows the court sustained each of the State's objections to defendant's references to his acquittal and instructed the jury to disregard defendant's references to it. We presume the jury followed the court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 82    Having concluded clear or obvious error occurred in this case, we next consider whether the error requires reversal and remand for a new trial pursuant to the plain-error rule. See *Wilmington*, 2013 IL 112938, ¶ 33. Defendant argues a new trial is warranted under the first prong of the plain-error rule because the evidence was so closely balanced the error alone threatened to tip the scales of justice against him. See *id.* ¶ 31.

¶ 83    "A 'closely balanced' case is 'one where the outcome of the case would have to be different had the impropriety not occurred.' " *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 47 (quoting *People v. Pierce*, 262 Ill. App. 3d 859, 865 (1992)). To determine whether the evidence adduced at trial was close, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This requires us to assess the evidence on the elements of the charged offense, along with any evidence regarding the credibility of the witnesses. *Id.* We are not concerned with the sufficiency of the close evidence but, rather, the closeness of the sufficient evidence. *Id.* ¶ 60. "If the defendant carries the burden of showing the evidence is closely balanced, the error is actually prejudicial." *Jackson*, 2019 IL App (1st) 161745, ¶ 47 (citing *Sebby*, 2017 IL 119445, ¶ 51).

¶ 84    We conclude the evidence was not closely balanced. The evidence, independent of Silva's testimony regarding the November 2015 incident, overwhelmingly established defendant knowingly and without legal justification caused bodily harm to and made physical contact of an insulting or provoking nature with Silva, who was a household member as that term is defined by statute. 720 ILCS 5/12-3.2(a)(1), (2) (West 2016); see 720 ILCS 5/12-0.1 (West 2016) (defining "family or household members"). At trial, Silva testified she and defendant argued in his vehicle, during which time she refused to exit and "pulled on" defendant. As she looked out the window, defendant struck her in the head. He then exited the vehicle, walked to the passenger side, opened the door, struck Silva a second time, and then pulled her out onto the ground. When officer Miller spoke to Silva at the scene, she told him defendant was "involved" in the battery.

¶ 85    In addition to Silva's testimony, the State also presented photographic evidence of Silva's injuries and video surveillance footage from outside the Smooth Fox, all of which largely

corroborated Silva's testimony. Our review of the surveillance footage shows defendant not only pulled Silva from his vehicle but also did so with forceful haste.

¶ 86    Further, the State presented strong circumstantial evidence of defendant's guilt. The surveillance footage from the scene showed defendant pulling Silva from his vehicle, and immediately entering his vehicle and driving away. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 77 (evidence of flight is circumstantial evidence tending to prove consciousness of guilt). When police arrived at his house to arrest him, Vega opened the door but, at defendant's direction, quickly shut it. The police, therefore, obtained a warrant and, when they arrived to execute it, swept the entire residence before ultimately locating defendant in the attic. See *People v. Pursley*, 284 Ill. App. 3d 597, 606 (1996) (evidence of hiding is circumstantial evidence tending to prove consciousness of guilt). Moreover, the State also presented evidence, including video footage, that defendant punched Mercer in March 2018 in a hotel room and lobby, which the jury could properly rely on as it related to defendant's propensity to commit the charged offenses in this case.

¶ 87    Defendant argues the evidence in this case "as it relates to Silva's credibility was closely balanced." According to defendant, his guilt hinged on whether the jury believed portions of Silva's testimony, as no other evidence went directly to the ultimate question of whether he, in fact, committed the offenses. He asserts Silva's testimony was inconsistent and contradicted by the video evidence. Defendant notes Silva testified she did and did not get into a fight with a woman at the Smooth Fox before she left, "believed" her injuries came from defendant striking her but also may not have come from him, and entered defendant's vehicle with and without his permission. He also points out Silva admitted she was angry when she arrived at the club and was intoxicated at the time of the incident, rendering her unable to recall some details. Finally,

defendant contends Silva's testimony that he punched her immediately before dragging her from the vehicle was contradicted by the video evidence, which did not show defendant punch Silva.

¶ 88    We acknowledge Silva's testimony was inconsistent on some of the details of the assault and that she was reluctant to testify against defendant. However, her testimony was not so inconsistent that it was incapable of belief on the key aspects of the offense, *i.e.*, that defendant struck her twice before pulling her from the vehicle onto the ground, especially given the strong circumstantial evidence tending to prove defendant's guilt. Additionally, nothing in the record indicates her reluctance to testify against defendant was due to the fact the incident did not, in fact, happen as she said it did.

¶ 89    Additionally, we reject defendant's argument Silva's testimony was contradicted by the video evidence. We agree the surveillance footage from outside the Smooth Fox does not show defendant punch Silva while she was in the car. However, as Miller explained, the video does not depict anything that occurred *inside* the vehicle, which is where Silva was when she was punched.

¶ 90    Defendant also relies heavily on Vega's testimony in support of his argument the evidence was closely balanced, implying her testimony established it was possible Silva's injuries were caused by someone other than defendant. He notes Silva admitted she got into a fight inside the Smooth Fox, and Vega testified that Silva and a woman named "Yvette" got into a fight in the Smooth Fox. However, Vega testified she did not see Yvette strike Silva, and Silva never testified that the "fight" in the Smooth Fox was physical. The jury would have had to speculate to find Silva's injuries were caused by the "fight" inside the Smooth Fox.

¶ 91    Defendant also points out the jury sent a note to the trial court, asking for clarification on the issue of justification as it related to the count of domestic battery alleging bodily harm. He asserts the jury's note indicated the jury questioned whether defendant was justified in removing

Silva from his vehicle and, based on the evidence presented at trial, the jury could have been contemplating that Silva was merely "a scorned lover who suffered injury as a result of a brawl with another woman inside the club and whom [defendant] reasonably removed from his vehicle when she grabbed him and refused to leave on her own." We are not persuaded.

¶ 92    The mere fact the jury sent notes to the judge during the deliberative process does not, without more, establish the evidence was closely balanced. *Wilmington*, 2013 IL 112938, ¶ 35. This is especially true when there is no indication in the record the jury had at any time reached an impasse or that the jurors themselves considered this a close case. *Id.* Here, the jury asked for clarification on the issue of justification as it related to one of the domestic battery counts. However, the jury's note contained no indication it had reached an impasse or the juror's themselves considered this a close case. *Cf. People v. Gonzalez*, 2011 IL App (2d) 100380, ¶¶ 14, 26 (finding jury's notes asking the court what it should do if it could not reach a verdict on one count, to define reasonable doubt, and for a copy of a police report indicated the jury had difficulty deciding the case). Simply put, without more, we are unable to discern anything from the jury's note other than the fact it wanted clarification on a point of law.

¶ 93                                    B. Jury Instruction

¶ 94    Defendant next contends the trial court erred by refusing to give his tendered defense-of-property instruction. Specifically, he asserts his theory at trial was that he was justified in using force to remove Silva from his vehicle after she refused to exit it, started to pull on him, and caused damage to the interior of the vehicle.

¶ 95    The State responds defendant affirmatively acquiesced to the instructions and cannot now complain the refusal to give the defense-of-property instruction was error. In support of its argument, the State observes, after it changed its position on the issue of self-defense and offered

the self-defense instruction, the trial court agreed to give the instruction and specifically asked defendant whether he was "satisfied" with the instructions, to which defendant responded in the affirmative. We agree.

¶ 96    "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). A party cannot complain of error to which it consented, as it would be manifestly unfair to allow a party a second trial based on error which that party injected into the proceedings. *Id.* The rationale behind the rule is to prevent a defendant from inducing the trial court to proceed in a particular manner at trial and then later using that as a basis to secure reversal on appeal. *Id.*

¶ 97    Defendant seeks to avoid application of the affirmative-acquiescence rule on the basis he "did not passively accept the final set of instructions but instead requested an instruction on the affirmative defense of defense of property, which the [trial] court rejected." In support, he relies on *People v. Jaimes*, 2019 IL App (1st) 142736, and *People v. Coan*, 2016 IL App (2d) 151036.

¶ 98    In *Jaimes*, we declined to apply the affirmative-acquiescence doctrine and instead reviewed for plain error the defendant's contention the trial court erred in its responses to jury notes. *Jaimes*, 2019 IL App (1st) 142736, ¶ 42. There, the defendant's attorney actively suggested responses to the jury's questions, which were different from the responses the trial court ultimately gave, but nevertheless agreed to those responses. *Id.* ¶¶ 23-24, 42. Under those circumstances, we were unable to conclude the defendant "*clearly* invite[d] the error." (Emphasis in original.) *Id.* ¶ 42.

¶ 99    In *Coan*, the State argued the invited-error doctrine applied where, during the instructions conference, the defendant objected to some instructions but not to others, contending the defendant's failure to object in some instances could not be characterized as "mere oversight" but, rather, was an agreement to the instruction. *Coan*, 2016 IL App (2d) 151036, ¶ 22. We rejected the

State's argument that the defendant's failure to object could be characterized as an agreement to use the instruction, and instead analyzed the unpreserved error under the plain-error doctrine. *Id.* ¶ 24.

¶ 100   This case, unlike *Coan*, does not involve a mere failure to object, and, unlike *Jaimes*, defendant clearly and affirmatively acquiesced to the instructions ultimately given by the trial court. Here, defendant offered instructions on the issues of self-defense and defense of property. The State originally opposed both instructions, but subsequently changed its position on the self-defense instruction. In light of the State's change of position, the court reconsidered its refusal of the self-defense instruction and gave that instruction to the jury. After doing so, the court informed defendant the defense-of-property instruction would not be given and specifically asked him whether he was now satisfied with the instructions. Defendant did not ask the court to offer both instructions despite the fact they were not inconsistent and could have both been given. Instead, defendant told the court he was satisfied with the instructions without the defense-of-property instruction. Under these circumstances, we conclude defendant acquiesced to the court's refusal to give the defense-of-property instruction and, accordingly, we find no error.

¶ 101   Defendant alternatively urges this court to consider this issue under the plain-error doctrine. We will not do so. Plain-error review is unavailable to parties who affirmatively acquiesce to the purported error. *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 19.

¶ 102   Even if defendant had not acquiesced to the set of instructions given by the trial court, we would conclude the court correctly refused to instruct the jury on the issue of defense of property. We note here the parties dispute the applicable standard of review. Defendant asserts the issue is subject to *de novo* review because the question presented is whether the record contains evidence supporting the giving of the instruction. The State urges abuse-of-discretion review, noting the

trial court gave the self-defense instruction and refused the defense-of-property instruction on the basis defendant met the evidentiary minimum.

¶ 103   The issue is whether the trial court erred by refusing a tendered instruction because the instruction had no support in the evidence. Accordingly, the applicable standard of review is abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶¶ 26-42 (resolving the parties' dispute over the applicable standard of review when the issue is whether the trial court erred in refusing an instruction on the basis that the evidence did not support it, clarifying the statement of the applicable standard of review in *People v. Washington*, 2012 IL 110283, and ultimately concluding the correct standard of review is abuse of discretion).

¶ 104   Initially, we note the instruction proposed by defendant was incorrect. It referred to defense of real, not personal, property. "Real property" is "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land," and "personal property" is "any movable or intangible thing that is subject to ownership and not classified as real property."   Black's Law Dictionary 1472 (11th Ed. 2019). Defendant's vehicle was personal property and, therefore, the proposed instruction was erroneous.

¶ 105   While defendant acknowledges the proposed instruction was faulty in this regard, relying on *People v. Hodges*, 234 Ill. 2d 1, 21 (2009), he argues we should excuse his error given his status as a *pro se* litigant, asserting that to reject his argument "on such a technicality would go against the general principle that *pro se* litigants['] arguments should be construed liberally."

¶ 106   It is well settled that courts will not provide special treatment to *pro se* litigants. See *People v. Fowler*, 222 Ill. App. 3d 157, 163 (1991). When a defendant elects to represent himself or herself, the defendant "assumes the responsibility for conducting his [or her] own defense and is not entitled to favored treatment." *Id.* We decline defendant's invitation to excuse his error based

solely on his status as a *pro se* litigant, especially when the trial court here specifically admonished him he would not get special treatment and he indicated his understanding.

¶ 107    In reaching our conclusion, we find defendant's reliance on *Hodges* is misplaced. In the passage of *Hodges* on which defendant relies, the court merely reiterated the long-standing principle that petitions filed under the Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2006)), should be liberally construed so as to allow "borderline" claims of constitutional deprivations to proceed. See *Hodges*, 234 Ill. 2d at 21. Here, on the other hand, the question is whether courts must give favored treatment to defendants who undertake their own defense. The answer to that question is clearly no. *Fowler*, 222 Ill. App. 3d at 163.

¶ 108    Second, we find the record supports the trial court's refusal to give the instruction. Generally, " 'a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his [or her] favor.' " *People v. Everette*, 141 Ill. 2d 147, 156 (quoting *Mathews v. United States*, 485 U.S. 58, 64 (1988)). The evidence supporting the instruction need only be slight. *Id.*

¶ 109    In her testimony, Silva denied she attacked defendant, tore the TV screens from the headrests and tried to hit defendant with them, or otherwise damaged the interior of defendant's vehicle. Silva's denials were not sufficient to support the giving of the defense-of-property instruction, and no other evidence was presented from which the jury could conclude that Silva damaged the interior of defendant's vehicle. Admittedly, Silva testified she entered defendant's vehicle and remained without his permission, and Vega testified defendant's vehicle was "fine" on the way to the Smooth Fox but, the next day, the TV screens had been pulled from the headrests and she observed a footprint on the side of the stereo. However, Vega never testified she observed Silva causing the damage. Indeed, the record is devoid of any evidence tying Silva to the damage.

The evidence did not establish a nexus between Silva and the damage, and the jury would have had to speculate to conclude defendant was justified in using force to defend his property. Accordingly, even if we were to overlook defendant's acquiescence to the set of given instructions, we conclude the trial court did not abuse its discretion by refusing the defense-of-property instruction.

¶ 110   Defendant, relying on *People v. Swartz*, 186 Ill. App. 3d 399 (1989), argues the record contained "at least slight evidence" supporting the instruction. *Swartz* is easily distinguished. In that case, both the victim and the defendant testified that the defendant struck the victim after she took his car keys and refused to relinquish them. *Id.* at 399-400. The evidence therefore established a nexus between the victim's conduct and the defendant's need to defend his property. Here, as noted above, there was no evidence tying Silva to the alleged damage to defendant's vehicle.

¶ 111                                    C. Sentencing Error

¶ 112   Defendant's final contention is that the trial court abused its discretion at sentencing by relying on charges pending against defendant. Specifically, defendant argues it was error for the court to accept and consider the State's exhibits regarding those charges without accepting live testimony. Because the court specifically stated it would consider those exhibits for the purpose of sentencing, defendant argues, he is entitled to a new sentencing hearing.

¶ 113   As an initial matter, we note defendant arguably forfeited review of this contention insofar as it relates to the jail battery case and the September 2015 Silva case, as defendant's motion to reconsider sentence asserted only the trial court erred by considering the Vega case. See *People v. Bruer*, 335 Ill. App. 3d 422, 425 (2002) (a defendant forfeits review of issues not raised in motion to reconsider sentence). However, the State does not argue defendant forfeited review of this issue and instead addresses it on the merits. Accordingly, we will address the merits of defendant's

contention. See *People v. Artis*, 232 Ill. 2d 156, 178 (2009) (the principles of forfeiture apply equally to the State).

¶ 114 A trial court may not ordinarily consider in aggravation of a sentence bare arrests and pending charges. *People v. Johnson*, 347 Ill. App. 3d 570, 575 (2004). It may, however, consider evidence of prior criminal conduct which did not result in a conviction, provided the State presents witnesses, who can be confronted and cross-examined, as opposed to hearsay evidence. *People v. Jackson*, 149 Ill. 2d 540, 548 (1992); *People v. English*, 353 Ill. App. 3d 337, 339 (2004). The reason for requiring such evidence be presented through live testimony is to permit the defendant the opportunity to rebut it through adversarial testing and to ensure the evidence is reliable. See *Jackson*, 149 Ill. 2d at 548; *People v. Hoga*, 109 Ill. App. 3d 258, 264 (1982).

¶ 115 Here, the State offered into evidence at sentencing two "police department synopsis sheet[s]" (which are akin to police reports), a recording of a 911 call made by Vega, and a police report, all of which referenced criminal conduct purportedly committed by defendant, but none of which resulted in conviction. The trial court accepted the materials and specifically stated it would consider them for the purpose of sentencing. The court did not hear any live testimony to support the hearsay statements, depriving defendant of the opportunity to cross-examine witnesses or rebut the evidence through adversarial testing. This was error. *Jackson*, 149 Ill. 2d at 548.

¶ 116 The State, relying on *People v. Gomez*, 247 Ill. App. 3d 68 (1993), and *People v. Thomas*, 111 Ill. App. 3d 451 (1983), argues its failure to present live testimony did not render the trial court's consideration of the pending charges improper, because it offered "other appropriate evidence" of the pending charges. We are not persuaded.

¶ 117 Neither *Gomez* nor *Thomas* support the State's position. In *Gomez*, we rejected the defendant's contention the trial court improperly considered his "bare arrests" when fashioning his

sentence, finding the court's mere mention of those arrests while considering his criminal history was harmless error. *Gomez*, 247 Ill. App. 3d at 73-74. We did not consider the question presented here by the State: whether police reports and a recording of a 911 call were sufficiently reliable so as to allow the trial court to rely on them in its sentencing determination. Moreover, while we recognized a court may consider evidence of criminal conduct for which no prosecution or conviction ensued, we cited to *People v. Richardson*, 123 Ill. 2d 322, 361 (1988), and *People v. La Pointe*, 88 Ill. 2d 482, 498-99 (1981), for that proposition, both of which involved *testimony* relating to the defendant's past criminal conduct not resulting in conviction. *Gomez*, 247 Ill. App. 3d at 74.

¶ 118   In *Thomas*, we held the trial court's consideration of mere arrests, which were listed in the defendant's PSI, standing alone and without further proof of the conduct alleged, were inadmissible in the sentencing determination. *Thomas*, 111 Ill. App. 3d at 454. In doing so, we rejected the State's argument "that mere allegations of prior criminal activity, without any supporting *testimony*, may be considered" at sentencing. (Emphasis added.) *Id.* Thus, *Thomas* inherently recognizes the State has an obligation to present live testimony regarding prior criminal conduct not resulting in conviction.

¶ 119   In any event, we find the trial court's consideration of the improperly admitted factor does not require a new sentencing hearing. When, as here, it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, the error is harmless. *Johnson*, 347 Ill. App. 3d at 576.

¶ 120   The record shows the trial court placed minimal, if any, weight on the conduct set forth in the State's exhibits. The court stated it would consider the State's exhibits at sentencing. However, the record reflects the court focused on the fact that defendant's prior convictions were mostly for

violent offenses, his lack of remorse and rehabilitative potential, and the need to protect the public. (We note the State relied on the jail battery case in its argument in aggravation. However, it devoted a large majority of its argument to the seriousness of the offense, the defendant's lack of remorse, his prior convictions, the effect of his actions on his victims, the need to protect the public, and deterrence of others.) Accordingly, while we find the State's presentation of this evidence and the trial court's acceptance of it was error, we are unable to conclude, on this record, the court's consideration of the improper sentencing factor led to a greater sentence. *Id.*

¶ 121                              III. CONCLUSION

¶ 122   For the reasons stated, we affirm the trial court's judgment.

¶ 123   Affirmed.